### DREW v. SALMON et al.

(Supreme Court, Appellate Division, Second Department. June 12, 1903.)

1. CORPORATE STOCK—CONVERSION—ASSIGNMENT BY PLAINTIFF—SUFFICIENCY OF EVIDENCE.

Evidence in an action for the conversion of corporate stock which had been pledged by plaintiff as collateral examined, and *held* to show a written assignment by plaintiff, in obedience to which, and to plaintiff's written order, defendants surrendered the stock to the assignee, and that hence plaintiff had no title.

Appeal from Trial Term, Kings County.

Action by Alice M. Drew against Hamilton H. Salmon and another. From a judgment for plaintiff, and from an order denying defendants' motion for a new trial they appeal. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, HIRSCHBERG, and HOOKER, JJ.

Alexander S. Bacon, for appellants.
Henry A. Powell, for respondent.

HOOKER, J. This is an action for the conversion of 5,000 shares of the capital stock of the Standard Gold Production Company, a Colorado corporation. In March, 1897, one Peter was the owner of a prospect in the state of Colorado, and Samuel H. Drew, the deceased husband of the plaintiff, undertook to raise money to carry on the mining of gold from that prospect. A promoter's agreement was entered into, and 75,000 shares of stock were issued for the mine. Peter received 15,000, one Sybrandt, who had advanced money to Peter, 15,000, and Drew 30,000; the balance, 15,000, remaining in the treasury. By the terms of this agreement Drew was to sell the treasury stock at 85 cents per share within 90 days. This he failed to do, and his time was extended nearly four months longer, to the 1st of January, 1898, at which time he had disposed of but a trifling amount of the stock. In February of that year Drew interested one Frederick H. Schroeder in the enterprise, and the latter was of opinion that he could in turn interest some of his friends, and obtain capital to carry on the business. He went to Colorado with Drew to examine the property, and advanced the sum of $350 to him for his expenses. At the time Schroeder became interested, a new division of the stock was necessary, and all the parties to the promoter's agreement contributed to a fund of 30,000 shares to be given to Schroeder with which to procure moneys to pay debts and erect a mill. After these contributions were made, it left Drew with 20,000 shares. Within five or six days of this new division, Drew caused his 20,000 shares to be issued in the name of his wife, this plaintiff, and took them away. Within 60 days thereafter he hypothecated 1,000 of these shares, and this led later to a difference between him and Peter, which was ultimately settled between them by Drew assigning and delivering to Peter 4,000 shares, for which Peter passed to Drew a general release. Schroeder succeeded in obtaining some capital, and the mill upon the property was set in operation. Its operation, however, was very expensive. It lost money until October, 1898, when it was shut down, the corporation being heavily in debt. A receiver was appointed in that month, and he continued in charge of the property until June, 1899. During this time Schroeder endeavored to raise a larger amount of money for the purpose of clearing up the indebtedness and operating and running on a more economical basis, and was nearly successful in obtaining a large amount of money for this purpose. At this time, in order to induce new capital into the corporation, the parties to the original pro-

.moter's agreement contributed a large part of the share still in their hands. It will be remembered that 'Drew possessed 20,000 after the last contribution. Of this he had hypothecated 1,000, and assigned to Peter 4,000 more. This left him with 15,000 shares, all of which he agreed to turn into the pool to secure those who were furnishing the new capital. Prior to this last division of stock, however, acting for his wife, he had hypothecated 5,000 shares with the defendants to secure the payment of a note for $350, dated October 7, 1898, and when Schroeder sought to execute the agreement between the original parties to the promoter's agreement, and to receive from Mr. Drew his 15,000 shares, his contribution in the last allotment, Drew turned over to him 10,000 shares, but was unable to surrender the balance on account of their assignment to the defendants. On the 14th of January, 1899, in order that Schroeder might obtain these shares from the defendants, he gave an order upon them, which is in evidence, and reads as follows:

"Brooklyn, Jany 14 1899.
"H. H. Salmon & Co.: Schroeder tells me he needs the stock I left with you. He will return the stock of $350.00 and interest from Oct. 7th, 1898. I can't take up the note now because I am unable to get out of the house.
"Very respy          [Signed]     Saml. H. Drew."

The agency of Drew for his wife, the plaintiff, in all dealings in connection with the stock of this corporation, is proved so clearly that it cannot be doubted, and is admitted by the respondent. The note for $350, held by the defendants, was due December 7, 1898, and was renewed for two months. The renewal matured on the 7th of February, 1899, but was not paid, and no attempt was made by either Drew or the plaintiff to renew it, and little further attention was given to it by them. Upon Drew's suggestion that Schroeder should give him a receipt for the 10,000 shares that had already been turned over, and that a writing should be made to cover the dealing of the whole block of stock, on the 4th of that month, while Drew was ill at his home, he wrote out by his own hand a memorandum, which Schroeder signed, and delivered to Drew. A copy, also in Drew's handwriting, was by Drew signed "Alice M. Drew, per Samuel H. Drew," and delivered to Schroeder. The paper read as follows:

"Brooklyn, May 4th, 1899.
"Rec'd from Alice M. Drew 15,000 shares of the Capital Stock of The Standard Gold Production Co., of Boulder Co., Colorado, for which I, Fred H. Schroeder paid in Feby 1898 $350.00 and the further sum of $350.00 and int., on same from Oct. 7, 1898 which said last mentioned sum I agree to pay H. H. Salmon & Co., of New York and the further sum of $500.00 which said last mentioned amount I hereby agree to pay to Alice M. Drew on or before Jany 1, 1900 provided the contemplated sale or re-organization is affected. If, however, the said Company's property is sold at Receiver's or Sheriff's sale to satisfy the claims against said Company said Schroeder shall not be liable for the said sum of $500.00 last mentioned."

On the 25th of July Schroeder went to the defendants' place of business, presented the order of January 14th and the contract of sale just quoted, and paid Drew's renewal note dated December 7th. One Burke, whom Schroeder had succeeded in interest-

ing in the property, supplied him with money with which to pay the defendants the money due on this note, and in the light of the testimony of the defendants and Schroeder, supported by the checks which passed at the time, and their indorsements, which are in evidence, it cannot well be doubted that the note was paid to the defendants, and the 5,000 shares held by them as collateral then taken up. On the day following—July 26, 1899—the plaintiff demanded from the defendants the return of the 5,000 shares of stock held by them as collateral, and on the 2d day of August made a formal tender of the amount which would then have been due on the note, and again demanded the surrender of the stock. The defendants refused to comply, and this action was brought, which resulted in a substantial verdict for the plaintiff. From the judgment entered thereon, and from the order denying the motion for a new trial, the defendants appeal to this court.

The execution and delivery between Schroeder and Drew of the agreement of May 4, 1899, is not seriously disputed by the plaintiff. The true legal effect of this agreement was, we think, misconceived at the trial. The plaintiff has denied throughout the litigation that this was an assignment of the 5,000 shares held by the defendants as collateral, though she offers no adequate explanation as to what it is, if not that. We have recited the facts at some length for the purpose of showing the circumstances leading up to the agreement of May 4th that this contract may be read in the light of the past dealings and acts of the parties. To receive a perfectly clear and lucid construction, it would not be necessary to pursue an investigation of the history of that stock so closely, but counsel and the court seem to have failed to give it the force and effect it commands. It requires no cunning to discover in it a simple agreement for the sale of 15,000 shares of the capital stock of the Standard Gold Production Company. Ten thousand shares had previously been actually delivered, and the remaining 5,000 were those which form the basis of this litigation. The consideration for the value is $700 in any event, and a further consideration of $500, contingent only upon the contemplated sale or a successful reorganization of the company. Prior to the demand upon the defendants, and before the commencement of this action, Schroeder had carried out the terms of that agreement of sale, for in February, 1898, he had advanced $350 to Drew for his expenses to Colorado, and on the 25th of July, 1899, he paid the Drew note in the hands of the defendants. Under the terms of the contract he had until the 1st of January, 1900, to pay the balance of the consideration. This suit was brought on the 3d day of August, 1899. Armed with this bill of sale and with the order given by Drew upon Salmon & Co. for the delivery of the stock, Schroeder came into possession of the stock on the 25th of July, 1899, lawfully, and as the true owner thereof, having taken title from the plaintiff before her demand and tender and before the commencement of this action. The plaintiff, therefore, had no title upon which she might base an action for conversion of the stock by the defendants. Such is the view we take of the evidence. The jury

should have given it the same effect. The judgment and order must therefore be reversed, and a new trial granted upon the terms usual in such cases.

Judgment and order reversed, and new trial granted; costs to abide the event.